UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY E. SMITH,

        Plaintiff,

v.                                          Case No. 17-cv-441-pp

DANIEL BANDI,

        Defendant.

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 23)**

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983. Dkt. No. 1. The court allowed the plaintiff to proceed on claims that the defendant violated his Fourth Amendment rights when the defendant allegedly stopped the plaintiff for no legitimate reason and allegedly used excessive force while arresting the plaintiff. Dkt. No. 8. The defendant filed a motion for summary judgment. Dkt. No. 23. The court grants the defendant's motion on the plaintiff's improper search claim, and denies the defendant's motion on part of the plaintiff's excessive force claim.

**I.    RELEVANT FACTS[1]**

On October 16, 2016, the plaintiff was living in Racine, Wisconsin, and was dating Aleece Gillespie, who was living in Kenosha, Wisconsin. Dkt. No. 45

---

[1] The court takes the relevant facts from "Daniel Bandi's Proposed Findings of Fact in Support of Motion for Summary Judgment" (Dkt. No. 26), "Defendant Daniel Bandi's Response to Plaintiff's Proposed Findings of Fact" (Dkt. No. 45) and the defendant's "Reply to Plaintiff's Response to Defendant's Proposed Findings of Fact" (Dkt. No. 47). The facts are undisputed unless the court indicates otherwise.

1

at ¶1. That night, the plaintiff and Gillespie had rented a 2015 Chevy Camaro. Id. at ¶3; Dkt. No. 26 at ¶121. At about 1:30 a.m., the plaintiff and Gillespie left a bar with some friends. Dkt. No. 45 at ¶6. After dropping off their friends, the couple headed to Gillespie's apartment, located on 17th Avenue and 50th Street. Id. Gillespie parked the car under two trees, where the street was only dimly lit. Id. at ¶11.

At about 4:00 a.m., the plaintiff, with Gillespie and her baby, left to go to a hotel. Id. at ¶8. Gillespie headed downstairs first with her baby. Id. at ¶9. The plaintiff followed shortly thereafter with the other belongings they were taking to the hotel. Id. at ¶10. The plaintiff states that he noticed the car's passenger side safety window had been broken out. Id. Gillespie went to the passenger side and leaned in to put her baby in the backseat. Id. at ¶13, 75.

At about 4:15 a.m., the defendant, a Kenosha police officer, was on patrol by himself, when he noticed a new, high-end sports car parked near the intersection of 17th Avenue and 50th Street. Dkt. No. 26 at ¶1-4. According to the defendant, that area of Kenosha is known for high crime, and that type of car is not common in the neighborhood. Dkt. No. 47 at ¶¶2, 5.

The defendant asserts that he noticed a person (later identified as Gillespie) with her left shoulder leaning inside the passenger side of the car. Id. at ¶6. The defendant states that he saw her crouch down when she noticed his squad car stopped at the intersection. Id. at ¶7. The defendant explains that, based on what he saw and his experience and training, he believed a crime was being committed. Id. at ¶8.

The defendant says he turned his car around and began driving toward the sports car. Id. at ¶10. He asserts that he was unable to radio out his location and request assistance because others were using the radio at the time. Id. at ¶11. The defendant indicates that he shined his squad spotlight so he could see the car and the sidewalk just west of the car. Id. at ¶12. According to the defendant, Gillespie had moved from beside the car to mostly behind one of the trees by the car. Id. at ¶13. The defendant states that he saw the plaintiff emerge from behind another large tree, next to where Gillespie was concealed. Id. at ¶14. The plaintiff, in contrast, asserts that he was not behind a tree when he first saw the defendant, but was helping Gillespie load the baby and other belongings into the car. Dkt. No. 45 at ¶24.

The defendant states that he parked and got out of his squad car so that he could investigate. Dkt. No. 47 at ¶16. According to the plaintiff, he asked the defendant why the defendant was harassing them, dkt. no. 39 at ¶25, but the defendant states that the plaintiff repeatedly said, "What did I do?" in a panicked voice. Dkt. No. 45 at ¶26.

The plaintiff began to walk toward the defendant and put his left hand into his pants pocket. Dkt. No. 47 at ¶20. The defendant believed the plaintiff was balling his hand into a fist, id., but the plaintiff explains that he had money in his front pocket, which made it only look like he was balling his hand into a fist, id. The defendant ordered the plaintiff to take his hand out of his pocket, and the plaintiff complied, but then he put his hand back in his pocket, dkt. no. 40 at ¶20. The plaintiff says that he complied every time the defendant

3

told him to take his hand out of his pocket, dkt. no. 39 at ¶34, but concedes that he kept putting his hand back in his pocket "because it was chilly and cold outside from the rain," id. at ¶35.

The defendant explains that the plaintiff's reaction and his repeatedly putting his hand in his pocket led the defendant to believe that the plaintiff was reaching for a weapon. Dkt. No. 47 at ¶21. The plaintiff agrees that he continued to put his hand in his pocket despite the defendant's order to take his hand out of his pocket, but he insists that he put his hand in his pocket only because it was cold outside from the rain. Dkt. No. 39 at ¶35.

The defendant states that to prevent the situation from escalating and to gain control of the plaintiff so he could speak to him, he "took hold of the plaintiff's left hand and right shoulder and moved [the plaintiff] to the back of the [car]." Dkt. No. 47 at ¶31. The plaintiff asserts that the defendant grabbed him by his shirt and, when the plaintiff asked, "what did I do wrong—what's going on?," it looked to the plaintiff as if the defendant was reaching for his service weapon. Dkt. No. 39 at ¶¶39-40, 42.

The defendant states that he let go of the plaintiff's left hand so he could reach his radio and call for assistance. Dkt. No. 47 at ¶35. He states that he was worried that Gillespie, who was standing on the sidewalk and yelling at him, might attack him. Id. at ¶¶36-37. The defendant asserts that as he was speaking on his radio, the plaintiff broke free and began to run toward the dark sidewalk. Id. at ¶39. The plaintiff explains that he was afraid the defendant was reaching for his service weapon, so he broke free of the defendant's hold and

4

tried to run to a better lit area where the public could see what was going on. Dkt. No. 39 at ¶43. The plaintiff asserts that he feared he "would become another statistical victim of 'white cop killing an unarmed black male.'" Id. at ¶44.

The defendant pursued the plaintiff. Dkt. No. 45 at ¶45; Dkt. No. 47 at ¶41. He grabbed the plaintiff's shirt (there is dispute over whether the defendant grabbed the plaintiff's shirt before or after the plaintiff broke away from the defendant) and ordered him to stop resisting, but, according to the defendant, the plaintiff resisted his attempts to gain control by turning in circles. Dkt. No. 45 at ¶39. The plaintiff's shirt ripped, and the plaintiff once again began to run away. Id. at ¶45. The plaintiff explains that he was not trying to resist; he was simply trying to get to a place where someone could see what was going on. Dkt. No. 40 at ¶45.

The defendant states that, because the plaintiff was actively resisting, he took his "Electronic Control Device (ECD)" (a Taser) out of its holster as he was chasing the plaintiff and shot it into the plaintiff's back for a five-second cycle, which is the shortest possible cycling time. Dkt. No. 45 at ¶47; Dkt. No. 47 at ¶¶48, 51; Dkt. No. 26, ¶50-51; Dkt. No. 45, ¶47. The plaintiff fell onto his forearms and chest. Dkt. No. 26 at ¶52.

According to the defendant, the plaintiff rolled around on the ground and tried to pull the Taser wires out of his back. Id. at ¶53. The defendant states that at that point, the plaintiff was only ten to fifteen feet away from him. Id. at ¶55. The defendant asserts that he was afraid that the plaintiff might have had

5

a weapon, so, because the plaintiff continued to resist, he used another five-second cycle charge. Id. at ¶¶55-57. The defendant explains that the second charge seemed less effective, so he was unsure whether the plaintiff had broken the wires or the probes had come off the plaintiff's back. Id. at ¶59. The defendant used a third cycle charge, this one for six seconds. Id. at ¶60; Dkt. No. 45 at ¶51. The plaintiff says that he had never been hit by a Taser before, and had no idea how to "fight or defeat" its effects; he says that the repeated Taser shocks left "punctured holes wounds" in his back that required medical treatment. Dkt. No. 39 at ¶¶50-53.

The defendant asserts that the plaintiff continued to pull at the wires, got up off the ground, and began to run away. Dkt. No. 26 at ¶62. The plaintiff explains that the Taser caused him excruciating pain, so he pulled at the wires to stop the pain. Dkt. No. 40 at ¶62. The defendant states that, because the plaintiff was running away and because the Taser wires are only twenty-five feet long, he disconnected the cartridge from the Taser and put it back in its holster. Dkt. No. 26 at ¶63. The taser probes remained in the plaintiff's back. Dkt. No. 45 at ¶55.

The defendant says that the plaintiff got up and started running away. Dkt. No. 26 at ¶¶62, 64. The defendant explains that every time the plaintiff fell, he would stop running so he could react if the plaintiff used a weapon against him. Id. at ¶65. Eventually, the plaintiff ran into a fenced-in backyard. Id. at 67. The defendant explains that, at this point, he was able to catch up to the plaintiff and tackle him to the ground. Id. at ¶69. According to the

6

defendant, the plaintiff placed his hands under his body, which made the defendant fear that the plaintiff was trying to access a weapon. Id. at ¶70. The defendant asserts that he ordered the plaintiff to stop resisting and to put his hands behind his back. Id. at ¶74. He explains that he used an open palm strike to the plaintiff's shoulder blade to try and get control of the plaintiff's arms so he could put him in handcuffs. Id. at ¶75. He states that used his left forearm to push down the plaintiff's left shoulder to try to pin him down. Id. at ¶78.

The plaintiff, on the other hand, asserts that he was not resisting, and that the defendant struck him with closed fist punches in his "upper right and middle neck area." Dkt. No. 40 at ¶75. He says that the defendant weighed about 100 pounds more than he did, and that the defendant was astraddle him while punching him with a closed fist. Dkt. No. 39 at ¶¶56-58. The plaintiff further explains that, because the defendant punched him in his face and because the defendant slammed his face into the ground, he lost a tooth and lost consciousness. Id. at ¶61. He says that another tooth was badly chipped, and that his jaw became swollen from the punching. Id. at ¶¶62-63. He also asserts that his pinky finger may have permanent damage; he states that he cannot straighten it or grip anything. Id. at ¶66.

According to the defendant, Gillespie ran toward them as they were struggling on the ground. Dkt. No. 26 at ¶81. The defendant asserts that he ordered Gillespie to get away; she stopped about twenty or thirty feet away from them but continued to yell at the defendant. Id. at ¶¶82-83. The

7

defendant states that he saw that Gillespie had a phone to her ear, and he was afraid that she was calling for people to come help the plaintiff. Id. at ¶¶84-85. The defendant explains that he was getting tired from struggling with the plaintiff, but he was able to take his pepper spray out of its holster. Id. at ¶87-88. The defendant states that he sprayed the pepper spray into the plaintiff's face for about one second. Id. at ¶89. According to the defendant, the plaintiff's muscle tone "lessened," which allowed him to place a handcuff on the plaintiff's right forearm. Id. at ¶91-92.

The plaintiff says that, once he was on the ground, he was not resisting, so there was no reason for the defendant to use pepper spray on him. Dkt. No. 40 at ¶¶89-91. He asserts that the defendant used his pepper spray twice, and, after the second time, that he was unable to breathe. Dkt. No. 39 at ¶70. He explains that he had a burning sensation in his eyes and face, that he had difficulty seeing clearly for a couple of hours, and that he slipped in and out of consciousness for an entire week after the incident. Id. at ¶71-72.

The defendant says that the plaintiff continued to struggle as the defendant tried to handcuff him, but that eventually, he was able to handcuff the plaintiff's left hand. Dkt. No. 26 at ¶¶92-99. He pulled the plaintiff to his feet and radioed to dispatch that he had a person in custody, informing dispatch of his location. Id. at ¶101. The defendant directed two other officers to take the plaintiff into custody. Id. at ¶105.

## II. DISCUSSION

A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

9

B. The Investigatory Stop

An officer may conduct a brief, investigatory stop if he has a reasonable suspicion that criminal activity is occurring. Ill. v. Wardlow, 528 U.S. 119, 123 (2000); Terry v. Ohio, 392 U.S. 1, 30 (1968). An officer may dispel his reasonable suspicion that a person has engaged or is engaging in criminal activity by briefly detaining the person. United States v. Boden, 854 F.2d 983, 992 (7th Cir. 1988).

To satisfy the "reasonable suspicion" standard, an officer must point to an objective justification for making a stop. Wardlow, 528 U.S. at 123. Courts look to the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." Green v. Newport, 868 F.4d 629, 634 (7th Cir. 2017) (citations omitted). While being in a high-crime area alone is not enough to support a reasonable suspicion, a high-crime area coupled with suspicious and evasive actions may support an officer's decision to stop an individual. Wardlow, 528 U.S. at 124-25.

The plaintiff has not raised a genuine issue of material fact regarding whether the defendant had reasonable suspicion to conduct an investigatory stop. He has presented no evidence to contradict the defendant's assertion that the area where the events occurred is known by police to be a high-crime area, nor does he rebut the defendant's assertion that it is uncommon to see a high-end sports car in that neighborhood. He concedes that Gillespie was crouching down and leaning into the passenger side of the vehicle at four o'clock in the

10

morning. Although the plaintiff asserts that Gillespie had an innocent reason for doing so (placing her baby in the car), the plaintiff does not provide any evidence to indicate that the defendant had reason to know what Gillespie was doing at the time he observed her.

The plaintiff also concedes that, after the defendant got out of his squad car, the plaintiff approached the defendant and repeatedly put his hand back in his pocket despite the defendant's repeated instructions to take it out. Again, the plaintiff says that he had an innocent reason for repeatedly putting his hands back in his pocket (he was cold and there was a large roll of money in his pocket), but the plaintiff has presented no evidence that the defendant was aware of those reasons.

The court finds that the undisputed material facts viewed in a light most favorable to the plaintiff establish that the defendant had a reasonable suspicion to believe a crime might be taking place. Given that, the law provides that the defendant could conduct a brief, investigatory stop to dispel his suspicion. The court finds the defendant is entitled to summary judgment on this claim.

C. The Defendant's Use of Force

The court reviews an excessive force claim under the "Fourth Amendment's reasonableness standard." Dawson v. Brown, 803 F.3d 829, 833 (7th Cir. 2015). There are several factors a court must consider when evaluating an officer's actions, including:

> . . . the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was

11

> resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duty.

Id. (citation omitted). According to the Seventh Circuit Court of Appeals, "the court's ultimate goal in examining these factors is to determine 'whether the force used to seize the suspect was excessive in relation to the danger he posed . . . if left unattended. Id. (citation omitted).

### 1. *The Initial Stop*

The undisputed material facts viewed in a light most favorable to the plaintiff show that the defendant used reasonable force when he grabbed the plaintiff's "left hand and right shoulder bicep area" and moved the plaintiff to the back of the car. Dkt. No. 47 at ¶31. It was the wee hours of the morning in a high-crime neighborhood, and the defendant had observed someone leaning into the passenger side of a car that seemed very out of place. After the defendant got out of the squad, the plaintiff began to walk toward him, asking the defendant what he had done. The parties agree that the defendant ordered the plaintiff to take his hand out of his pocket. They also agree that, while the plaintiff initially complied, he continued to put his hand back into his pocket.

The defendant asserts he saw a bulge in the plaintiff's pocket, or that it appeared that the plaintiff was balling his hand up into a fist. The defendant says that he suspected that the plaintiff had a weapon. The plaintiff explains that he did not have a weapon. He had a large roll of cash in his pocket, and it was cold. It is likely that the plaintiff was unconsciously placing his hand in his pocket because he was nervous about the cash, which, under his rules for

12

supervision, he was not permitted to have. The question for the purposes of use of force, however, is not why the plaintiff was doing what he was doing. It is whether, "from the perspective of a reasonable officer on the scene," the defendant's actions were "'objectively reasonable' in light of the facts and circumstances confronting" that officer. Graham v. Connor, 490 U.S. 386, 396-97 (1989) (citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id.

The facts and circumstances confronting the defendant when he grabbed the plaintiff's hand and bicep and moved him toward the back of the car were as follows: around 4:00 in the morning in a high-crime neighborhood, under circumstances where it appeared that the defendant might have walked into a car theft, the plaintiff was walking toward the defendant, with his hand in his pocket, and despite repeated requests to keep his hand out of his pocket, kept returning it there.

Even viewing these facts in the light most favorable to the plaintiff, the court concludes that the plaintiff has not raised a genuine issue of material fact as to whether the defendant used reasonable force when he sought to gain control of the plaintiff by grabbing his hand and shoulder and moving him to the back of the car in order to talk to him. The court will grant summary judgment to the defendant on this aspect of the plaintiff's claim.

## 2. *The Arrest*

The parties agree that after the defendant grabbed hold of the plaintiff, the plaintiff broke free and began to run. In doing so, the plaintiff not only bolstered the defendant's initial suspicion that the plaintiff was committing a crime, but he actually committed a crime. See Tom v. Voida, 963 F.2d 952, 960 (1992) (holding that a suspect's flight from an officer may ripen the officer's suspicion into probable cause); Wis. Stat. §946.41 ("whoever knowingly resists or obstructs an officer while such officer is doing an act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."). According to the defendant, he continued to believe—based on the bulge in the plaintiff's pocket and the plaintiff's repeated return of his hand into his pocket—that the plaintiff possibly had a weapon and could pose a threat to the defendant or others. Accordingly, the defendant was entitled to use a reasonable amount of force to prevent the plaintiff's escape and effect the arrest. See Brooks v. City of Aurora, Ill., 653 F.3d 478, 486-87 (7th Cir. 2011). The question is whether the amount of force the defendant chose to use was reasonable.

The defendant used his Taser to stop the plaintiff from running; once the plaintiff was on the ground, the defendant used the Taser again. The defendant says that he needed to use the Taser more than once to try to subdue the plaintiff; the plaintiff says that the repeated Taser shocks knocked him to the ground and caused puncture wounds in his back. Despite this fact, the plaintiff got up from the ground and continued running. The Seventh Circuit has held that it was reasonable for an officer to use a Taser when a defendant

14

ignored the officer's command to stop. U.S. v. Norris, 640 F.3d 295, 303 (7th Cir. 2011). See also McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011) (finding that an officer's use of a Taser to prevent a suspect from escaping was permissible, even though the charges against the suspect were misdemeanors). The court finds, given that decision, that even viewing the facts in the light most favorable to the plaintiff, the defendant's use of the Taser to stop the plaintiff from running was reasonable.

The plaintiff states that after the defendant tackled him, the defendant, who weighed about a hundred pounds more than the plaintiff, pinned him down and started punching him in his back, neck and face with a closed fist. The plaintiff also alleges that, despite the fact that he had stopped resisting, the defendant sprayed him twice in the face with pepper spray. The defendant disagrees with the plaintiff's characterization. He states that the plaintiff continued to resist. The defendant explains that he used an open palm strike to the plaintiff's upper back as way of forcing the plaintiff to show his hands. He denies striking the plaintiff with a closed fist, and asserts that he sprayed the plaintiff with pepper spray only once after he was unable to gain control of the plaintiff's arm.

The court finds that there is a dispute as to an issue of material fact regarding the amount of force the defendant used on the plaintiff after he tackled him, and whether that force was reasonable given all of the facts and circumstances. Police officers cannot use significant force on suspects who are no longer resisting or who are only passively resisting. Abbott v. Sangamon

County, Ill., 705 F.3d 706, 732 (7th Cir. 2013). If a jury were to believe the plaintiff's version of the events—namely, that the defendant repeatedly punched him in the face and neck with a closed fist and pepper sprayed him twice after he had stopped resisting—it could reasonably find that the defendant's use of force against the plaintiff after he was on the ground was excessive. Cyrus v. Town of Mukwonago, 624 F.3d 856, 863 (7th Cir. 2010) (holding that as circumstances change, so too should the degree of force used); Sallenger v. Oakes, 473 F.3d 731, 740 (7th Cir. 2007); Sobuh v. Heath, Case No. 12-cv-57, 2014 WL 3660457, at *6-7 (N.D. Ind. July 23, 2014).

The defendant argues, however, that he is entitled to qualified immunity. An official is entitled to qualified immunity if a plaintiff fails to show that a violation of a constitutional right occurred or fails to show that the right was clearly established at the time of the alleged violation. Williams v. City of Chi., 733 F.3d 749, 758 (7th Cir. 2013).

The law is clear that an officer cannot use substantial force against an individual who has ceased resisting. See Abbott, 705 F.3d at 732 (holding that it was clearly established before 2007 "that police officers could not use significant force on a nonresisting or passively resisting suspects" and that "police officers cannot continue to use force once a suspect is subdued"). The defendant was on notice that using force against an unresisting individual violated the Constitution. If a jury were to accept the plaintiff's version of events, it would mandate the conclusion that the defendant's actions after he tackled the plaintiff violated a clearly established constitutional right.

Because the plaintiff has raised a question of fact as to whether the defendant used reasonable force against him after the defendant tackled him, the defendant is not entitled to qualified immunity, and the court will deny his motion for summary judgment on this issue.

### III. CONCLUSION

The court **ORDERS** that the defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Dkt. No. 23. The court **ORDERS** that the plaintiff may proceed on his claim that the defendant used excessive force against him, in violation of the Fourth Amendment, after the defendant tackled him.

Because the plaintiff has a claim that has survived summary judgment, the court will recruit counsel to represent the plaintiff. Once the court has found an attorney willing to represent the plaintiff, the court will provide the plaintiff with an agreement, which the plaintiff can sign if he agrees to accept representation under the conditions the court provides. Once counsel is on board, the court will set up a scheduling conference with the lawyers, to discuss next steps.

Dated in Milwaukee, Wisconsin this 9th day of July, 2018.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**